Mr. Ackerman, good morning. Good morning. If the court please, I'm Alan Ackerman. Mr. Joseph Bonero sits behind me from Chicago Heights. He's my associate counsel. Mr. Leonard, if the court please. Mr. Horato, Senator Bastille as we speak, serving a 12-year sentence with an immigration order, I'm sorry, an immigration warrant, which prohibits him from getting anything from good time to engaging in IDOC activities, including extra good time credit. Having said that, the facts are not disputable for the most part. And that is to say Mr. Horato was driving a vehicle. His wife Donna was the only passenger. He was stopped for According to the information we have, he was taken to the police car and in a fit of fear, I believe, fear of his wife, he not only confessed, but he said she knows nothing about it. With that, both were arrested, both were charged, and after he was initially indicted for possession with intent to deliver 30 pounds of marijuana, the state upped the ante and returned his superseding indictment, adding a count, narcotic trafficking. Donna and Mr. Horato were represented by the same counsel. They were both eventually released on bond and in trial. Mr. Horato's lawyer represented Donna. Initially filed a couple of pre-trial motions, a motion to suppress, a motion to quash. He withdrew those motions and without further ado, there was a pre-agreement, a verbal pre-agreement, and the agreement was that he would plead guilty to the guilty plea. Did his lawyer tell him in such clear and explicit terms that he would be deported back to Iraq? The clear answer from the record is no, and I believe the state will concede that. Moreover, the trial court did not offer the admonitions that come with a guilty plea. Not a word was said about, by the way, if there's immigration consequences, you should think about that. Nothing was said. Nor was the court reminded by either the prosecution or defense that it might be a good idea to include those warnings or admonitions as part of the guilty plea in this case. None of that happened. He was sentenced within a year. We filed a post-conviction petition. We laid out not only what we just said, but there was a conflict of interest because the label linked LINKED pre-agreements, and that is to say that there's enough in the record to support the proposition that in exchange for the defendant taking a 12-year sentence, his wife would get a three-year sentence, but as it turned out, Donna had the good sense to hire separate counsel eventually, and she got probation. Now, we know that neither the trial court nor the lawyer told the defendant that he was not subject to mainly deportation, but rather mandatorily, because you are talking about narcotic trafficking, he was going to be deported, and there's little question from the post-conviction record that those questions were asked by husband and wife to defense counsel, and defense counsel, I'll be charitable, and I'll say waffle. Yeah, it could be a concern. No, it isn't. It's a state case. Don't worry about it. It's not a federal case. It's marijuana. It's not something else. Yeah, there might be a problem, but it's not anything to worry about. That's a sum and substance of what he was told. What should the defendant have been told? Now, there's some thinking here that the Illinois Supreme Court has people versus values before it, and that might make a difference. I'd like to differ with the court. It can't make a difference, because in Valdez, the trial court not once, not twice, but arguably three times admonished Mr. Valdez that, by the way, there's some problems here that you might have by way of deportation if you're a non-citizen. There's consequences here, but the lawyer did not tell him that. So this court arguably was divided with Justice McDade writing for the majority, and the majority opinion in Valdez indicated basically that it's the lawyer's job to make sure the defendant knows that there's a deportation consequence here, and in this particular case, beyond any doubt, he was subject to deportation for narcotic trafficking, and therefore, when Donna and the defendant said to the lawyer, not once, not twice, but several times, what's going to happen to Nader? He's not a citizen. He should have been told by the lawyer in succinct, clear, and explicit terms that, sir, your conviction, whether by guilty plea or otherwise, will probably, presumptively, mandatorily culminate in your deportation. Mr. Ackerman, the way that Valdez might be relevant here is on the issue of prejudice. What's your argument with regard to prejudice? I would suggest, if the court please, that Padillo answers that in part, and more importantly, the dissent in Valdez by Justice Holdridge, a brilliant dissent, I might add, spelled out very clearly, very clearly, that you know what? You don't have to be innocent. You don't have to be actually innocent. You don't have to play innocent. You don't have to show you have a valid defense, because deportation will have such horrific consequences that even if you don't have a defense, says the U.S. Supreme Court, by the way, my goodness, it might be worse to be deported than spend 10 years in prison here so you can see family, friends, communicate with those that you know. So your position is that prejudice is presumed? It's automatic. It is a presumption of prejudice that cannot be that the bare fact that counsel is inept in failing to provide clear, succinct, and explicit warnings carries with it prejudice. Now, I'm sorry. The majority in Valdez believed that presumptive damages or presumptive prejudice should be the case, but acknowledged that that's not the Illinois Supreme Court's opinion. Well, then how do you measure prejudice if the court please? Remember that antecedent to that is this court's case in Guzman, which the Illinois Supreme Court also vacated, but Justice Kilbride made sure that everybody knew that, wait a second, even if the court doesn't give those 113-8 admonitions, it's the lawyer's job, and even at that, if there's real injustice, we reverse, and that's the message from the Supreme Court in Guzman. But Justice Kilbride also said that prejudice has to be proven. Well? That real injustice has to be proven. Justice McBride, may I say this? In our opening brief, we cited Guzman for Justice Kilbride's opinion. You did. The state filed no reply or response to that, and we also cited people versus Correa, and Correa discussed the same issue, and the issue was imply prejudice, if the court please. And there, like here, the lawyer did not serve the Sixth Amendment to that defendant. We have a little bit more, such as it is, and we raise the issue of conflict. Now, the post-conviction court said nothing about that issue. However, the appellee, Mr. Leonard, wisely spoke or wrote in terms of, well, wait a second, maybe there is a conflict, maybe there isn't, but the record doesn't really show it. Well, let's see what the record shows. The record shows that there are unrebutted affidavits from Donna Harada, from Mr. Harada, which discuss how the lawyer is representing both of them at the same time. And questions were asked by Donna, who, by the way, is far, far smarter than the defendant. I say that in passing, having had the privilege of talking to her at least a dozen times, and her reminding me what the law is from time to time. Having said that, the affidavits make clear, absolutely clear, that there should have been something told to the trial court by either the prosecutor or defense that, by the way, these are linked possible pre-agreements, and if the defendant takes his 12-year sentence, we're going to suggest three years for her. Now, is that a conflict? You bet, because one defendant is giving up a great deal in order that the other profit, and both are clients of the defendant. I'm sorry, of counsel. And again, the record is absolutely silent concerning any warning from the court, any suggestion by the Vernon prosecutor in the case below, that by the way, Judge, defense counsel represents husband and wife, perhaps we should have a conflict discussion and let them waive or let them not waive, but the court should be advised. Finally, and I know this is icky, and I'm fronting it, from the record, it's clear that the defendant drove from Michigan to California and was driving back to Michigan from California when he was stopped by I-80 with 30 pounds of marijuana. As I read the record, and I think I read it fairly, there is nothing to show that the 30 pounds that he acquired, and she acquired, by the way, because she pled guilty to a lesser charge, if that was grown here, and plenty of marijuana is grown in Illinois, and we have specific statutes about punishing manufacturing in Illinois, but suppose that they stopped before they got to I-80, let's assume they were in southern Illinois, and they bought the 30 pounds of marijuana there. Would there be a narcotic trafficking charge? No. Not the way we see it. Because that marijuana was purchased here and he was traveling in Illinois. Is that a dead bait winner? No. Is it something to consider in the ensemble we think so. And thank you. I yield to Mr. Leonard, my learned opponent. Mr. Leonard, good morning. Good morning. May it please the court, counsel, with respect to the first issue, I believe the crux of the issue is what does the attorney have to tell an immigrant or a non-citizen before pleading guilty? Padilla said you only have to tell them there's a consequence that you may be deported if you plead guilty to the offense. This court in Valdez said that if it's clear that you will be mandatorily deported, defense counsel must tell the defendant that or he's ineffective and he should be able to withdraw his plea. Are you disputing the trial court's finding that his performance fell below a standard of competence? No, I'm not. I'm saying what the issue is is what does the defense attorney have to tell the defendant? The defense attorney stated that he told the defendant here that he could be deported. The issue revolves what I believe on the issue of could and will. So are you using Padilla for that proposition? Yes, I am. Okay. Is that a fair reading of Padilla? I believe it is. Okay, so what do we have here? What we have here is a case that would fall squarely on Padilla. Do you think it's unclear or uncertain about the immigration consequences? No, it's not. It is clear that he would be mandatorily deported, but is it the defense attorney's job to go and study immigration law, become an immigration specialist? Well, Padilla was giving an out to attorneys saying, you know, immigration law is complex. It's a specialty, etc., etc., etc. But wasn't it fairly clear that there are clear consequences that even a first client of that? They said that in the opinion, if there's clear and concise consequences. And you just said there were? There were, but did the defendant, defense attorney, have to go out, study immigration law, and tell him that this is what will happen if he pleads guilty? Our position is defense attorneys are not immigration attorneys. It's good enough if you tell the defendant you could be deported. So your position wasn't in effect? It was not in effect of assistance. And I believe that's the issue in Valdez, along with Justice McDade's comment, is whether you have to prove prejudice. I believe Valdez will probably answer those two questions. That's why I asked that this court hold the case in abeyance until Valdez is decided. I think it would be the prudent decision to hold it in abeyance. Valdez has been briefed and fully argued. I checked yesterday. There's no opinion yet. I expect an opinion fairly soon. Mr. Leonard, the Supreme Court in Korea, Justice Ryan, I think, made a distinction between, I don't know exactly how to say this, because he didn't say that strictum only applies in the court. But he did make a distinction between whether the defendant asks the attorney prior to the court proceedings. And the implication, if not the direct statement from Justice Ryan, was that if the defendant is asking that the lawyer has an obligation to investigate at that point, I believe that that's a fair reading of Korea. That's the way I understood it. So does it make a difference in this case that Mr. Halada asked repeatedly, and his wife asked repeatedly, and his son asked repeatedly, are there going to be immigration consequences here? And the attorney said, nah, it's not going to matter. There are bigger fish to fry. Does that make a difference? I believe it doesn't make a difference. I believe the language is, what does the defense attorney have to tell the defendant? Does he say, you may be deported or you will be deported? I think that's the crux of this issue, the idea of Valdez, Korea. And I believe the Supreme Court will address that issue, because that was the issue in Valdez. Does the Code of Professional Conduct have any bearing here, where the lawyer is required as part of the code to make sure that in a plea agreement, his client completely understands what the ramifications are of that plea agreement? Well, this is, I think, a hybrid issue, because it does deal with immigration. And I think we need the advice of what the Supreme Court in Illinois is going to do on this issue. Are they going to pedia, or are they going to make, extend pedia to require a defense attorney to look for the ramifications of what the guilty plea is actually going to, the collateral consequences to this guilty plea will entail? Is it going to be mandatory, or is it going to be permissive? I'm still having a problem with, you admit that they're clear, concise immigration consequences for pleading guilty to narcotics trafficking, is that correct? Yes, if you research the immigration law, and you... And so what did pedia say in that context? What is the obligation? Well, if they know, the defense attorney knows that he should tell his client, but again... So we're actually talking about, not whether objectively they're clear and concise consequences, but it's what the defense attorney knows, that's the way you read the... Yes, and what does the defense attorney have to do to find out what those consequences are? And pedia, I believe, gave defense attorneys the obligation to tell the defendant if the defense attorney knows, but the defense attorney does not have to go out and specifically find out what those consequences are for each non-citizen defendant, which he has before the court. I believe that the correct reading of pedia is, all you have to do, your defense attorney is to tell your defendant there could be possible consequences. You don't have to go out... Regardless of whether they're clear and sustained in office. Correct. Really? That's your reading of pedia? Yes. Okay. So I believe it would be prudent for this court to hold the case in abeyance until Valdez is decided. If you have any other questions on this issue... But isn't it a two-prong test, even though you may say the counsel was deficient objectively? Correct. Because there were clear, concise consequences the counsel did not inform the defendant of? Correct. Does there have to be more in this analysis than that? Of course there needs to be more. What is it? You have to prove that, but for counsel's erroneous advice, that the defendant would not have pled guilty to the offense. Here, there can be no prejudice. The defendant actually admitted it was his cannabis. He admitted to the offense, whether he pleads guilty, or whether he has the opportunity to withdraw his guilty plea and go to trial. So you're saying the majority holding in Valdez would... Because that was the majority holding in Valdez? Yes. And so you're saying that's the law, and that wasn't here? Right. So there's no prejudice here. He's going to be deported, whether he pleads guilty, or whether he goes to trial. I believe the evidence is overwhelming. I'll address the factual basis later, but if you don't have any more questions on the issue of what defense counsel has to actually tell the defendant, I just ask that you hold it in advance, because I think the Illinois Supreme Court will decide what to do in this case when they reach a decision in Valdez. So you're hoping the clouds will be lifted, sunshine will come through? Yes, I believe that I agree with your dissent in Valdez, that it's good enough just to tell the defendant he could be deported, but still you need to show prejudice. Mr. Leonard, was there a mandatory minimum sentence for the trafficking charge? Yes, that's 12 years, and that's what the defendant fled to, and he received 12 years. That was the lowest sentence he could possibly receive? That was the minimum sentence. It was 12 years to, I believe, 30 years, and he received the minimum sentence. So the only way to sweeten the deal would have been for him to plead guilty to one of the other charges? Yes, the only way to sweeten the deal would be to plead guilty to a lesser charge, which would be unlawful possession with intent to deliver. The attorneys negotiated that he would plead guilty to the cannabis trafficking because the defendant, he admitted his guilt. I believe he got a good deal. I don't know what the consequences are better, either 12 years in the Department of Corrections or 30 years in the Department of Corrections and still be deported to Baghdad, Iraq. You mean by getting the mandatory minimum? Yes. Mr. Leonard, before you go on to the factual basis, I have another question. Okay. Is there value in the defendant having the opportunity to weigh his decision and to actually make a choice based on full knowledge? Yes, the defendant should have full knowledge of his guilty plea. And if he doesn't have that knowledge, is he prejudiced? If he's prejudiced, it depends if there's a reasonable probability that the outcome... No, I'm asking you just about the process and the choice. If he's deprived of that probability. Again, I would say it depends on the facts of the case. And in this case, he was not prejudiced because he's guilty. He said he was guilty. What matters if he pleads guilty or if he's found guilty by a trial, nothing is going to change because he's still going to be mandatorily deported. Well, yes and no. There is such a thing that people don't like to discuss. It's called trial tax. Yes. So he could get a longer sentence. He could get a longer sentence. In this situation, I believe that the defendant received a favorable deal. Well, it depends on whether you prefer Kabul to Penitentiary in Illinois. Baghdad it was. Well, you never know where you're going to end up over there. Okay. Yes. And that's a question I can't answer. He was 15 years. Well, you can't answer, but perhaps he could have if he'd known that. He could probably answer. He was 15 years old when he came here. So obviously, he probably knows the language and culture. This isn't a person who came here when he was a child and has no recollection or any ties to this foreign country, his native country, I should say. Which means he might want to stay here longer under any circumstances, as opposed to going to Kabul or Baghdad. Correct. So he's going to be deported either way. I don't see any prejudice. Okay. Okay. With respect to, I just want to touch briefly on the second issue. I disagree that there was any conflict of interest or quid pro quo or link between the defendant's pleading guilty and his wife pleading guilty. The defendant was charged with the cannabis trafficking, which is a greater offense. The defendant's wife was less culpable. He said it was his cannabis, not hers. So it's only speculation that there's some kind of link. Joint representation of defendants is not a per se conflict. You have to show an actual conflict. I don't believe that actual conflict or any link is found in the record. And finally, with the factual basis, I lay out the whole factual... Did she admit she knew it was in the car? No, there's no... So isn't the conflict, I didn't know it was there and it was his? We have no... Are those defenses completely at odds? We don't have any information of what she knew in this case. She was tried in a separate case number and we don't know what her plea agreement was.  And so we don't know. She must have made some incriminating statements or decided to plead guilty to the lesser offense and she did receive... At the time of the stop, he said it's mine, she said nothing. So that creates a potential defense that's entirely at odds with each other, I think. But... Not necessarily. I cited to a case, I don't remember if it's in my brief, but I refer you to my brief in that case. It says even if you have... You can negotiate a more favorable deal for one client or another, there's no conflict of interest unless it's actually shown. Counsel's time. And just with the letter, I just refer you to page 12 regarding the factual basis. There's more than enough evidence to show that his guilty plea is valid. Thank you, Mr. Leonard. Are there any more questions? No. Mr. Ackerman, do you want to go? If I may. While I have a great deal of admiration and respect for my opponent, I beg to differ with the opinions vis-a-vis prejudice that he's attempted to present to the court in a persuasive fashion. There is no persuasive way for this court to believe for a fleeting moment that the absence of clear, succinct, and explicit warnings to the defendant failed to rise to an effective assistance of counsel under any circumstances. There is nothing here in this record from the court or defense counsel telling him, Mr. Arada, you're never going to get a good conduct medal, and you're going to be deported. I'm not saying he should ever get a good conduct medal, but he should have the choice of going to trial and proceeding on pre-trial motions, which incidentally were withdrawn by the same lawyer, and maybe the circuit court would suppress the evidence, suppress the confession, and maybe there would be no trial, period. All of that was gone here. Let us not for a moment think there's no prejudice to this defender. I thank you for listening. I'm sorry if I raised my voice, but I happen to believe very strongly in what I'm saying. Counsel, I have a couple of questions for you. Yes, ma'am. Yes, ma'am. Has your client been deported? Pardon me? Has your client been deported? Has my client? Been deported? No. He's serving his 12 years as ADOC as we speak. So the risk of deportation has been postponed for the number of years he's going to be incarcerated? It has not postponed in the sense that the federal government is going to forcibly remove him from the DOC while his sentence is still ongoing. However, he will not be released. He will be turned over to immigration and quickly deported. So he will not serve the 12-year term? Yes, he will. He will. He'll serve the term? No question about it. And then he'll be deported? No question about it. But he could have been deported if the state had dismissed the charges right away. So there's a bit of a benefit. He's still in the United States. Yeah. And if he had gone to, with respect, had he gone to trial, let's say he got 30 years because he would have lost, that's hypothetical. As in other cases from the federal courts, that means that he would have the benefit of friends, family here during those years. And that's a benefit. How much bond did your client post? One hundred thousand dollars. Do you think there's a possibility that that amount of money drove the plea bargain in this case? Because it appears to me that the judge spent a lot more time discussing the fine. One hundred thousand, one hundred and twenty-five dollars and had pre-calculated the five dollar per diem. It seems to me the trial judge overlooked some of the obvious consequences of perhaps deportation and the need to admonish your client. Because I can almost envision everybody rubbing their hands together because there was a hundred thousand dollars that was going to leave the bond fund and go to be dispersed. So, do you think there's a possibility that that fine drove the negotiations? Justice Wright, all I know is the state and the county of LaSalle took that one hundred thousand dollar bond, every penny of it, and his wife's one hundred thousand dollar bond, although she got probation. Same amount, thirty pounds, state took it from his bond, her bond, two hundred K gone. That's what happened to the money. And again, following up to Justice McDade's question about where is the prejudice, you argue that deportation is so imminent it is prejudicial. But how do you counterbalance the argument that he is going to be here for a number of years before he's deported? How does that affect your prejudice argument? I respect the question. I have difficulty answering it because had it been properly represented, the probability is we wouldn't be here. Because had we been told, clear, concise, succinctly, hey, you're gone, he would have turned around and said, wait a second, put back my motion to suppress, that's part of the record already withdrawn, put back my motion to quash my confession, let me have my hearings, let me have what I'm entitled to. Maybe he prevails. But you haven't raised ineffective assistance of counsel for withdrawing those motions. I cannot say that. I can ask Your Honor and the court to look at an entire picture here, an entire picture. I understand. And I tried to look at the issues that are raised because it's your case and not our case. But I often see myself looking at the big picture, as you've suggested that we do. I appreciate the dialogue. Thank you. Thank you. We thank both of you for your arguments this morning. We'll take the case under advisement and we'll issue a written decision as quickly as possible. The court will now stand in brief recess for a panel change. Please rise. Does the court stand in recess?